# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Rick Fisher and Rosella Fisher, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| Plaintiffs, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| vs. | ) | |
| | ) | |
| Continental Resources, Inc., | ) | Case No. 1:13-cv-097 |
| | ) | |
| Defendant. | ) | |

Before the Court is Defendant Continental Resources, Inc.'s ("Continental") motion for summary judgment filed on March 7, 2014. See Docket No. 11. The Plaintiffs, Rick Fisher and Rosella Fisher ("Fishers"), filed a response in opposition to the motion on April 4, 2014. See Docket No. 18. Continental filed a reply brief on April 18, 2014. See Docket No. 20. For the reasons set forth below, the motion is denied.

## I.    BACKGROUND

The Fishers are Montana residents who own real property in Bowman County, North Dakota. The real property owned by the Fishers which is the subject of this litigation ("Subject Property") is described as follows:

> Township 131 North, Range 106 West
> Section 17:    E1/2NE1/4

Continental is an oil and gas exploration and production company organized under the laws of the State of Oklahoma, with its principal place of business located in Oklahoma City, Oklahoma. Continental conducts operations in western North Dakota, and is the operator of a salt water disposal well located on the Subject Property known as the Lonesome Dove 42-17 SWD well.

The Cedar Hills field was established in 1995. In 1999, Continental and a competing oil company sought to unitize the Cedar Hills Field. When the two companies could not agree on how to proceed, the North Dakota Industrial Commission split the Cedar Hills Field into two units. One of the units created was the Cedar Hills North Red River "B" Unit ("Unit"). The Unit became effective March 1, 2001, by order of the North Dakota Industrial Commission after the requisite number of mineral owners and working interest owners ratified the Unit Agreement and Plan of Unitization ("Unit Agreement"). See Docket No. 14-1, pp. 15-16. The Subject Property and the Lonesome Dove 42-17 SWD well are located within the Unit. The record is unclear as to who owns the minerals underlying the Subject Property. It is also unclear from the record whether the minerals underlying the property have been leased.

Continental is the operator of the Unit. The Unit consists of approximately 50,000 acres located in Bowman County and Slope County in southwestern North Dakota. As an oil field ages, the ratio of salt water production to oil production often increases, as it has with the field underlying the Unit in this case. In January of 2014, there were approximately 114 oil and gas wells located in the Unit which produced 355,267 barrels of oil, and 643,070 barrels of salt water. Continental uses salt water disposal wells to dispose of the majority of the waste water produced in the Unit. The record does not reflect how many salt water disposal wells are located in the Unit.

In 2011, Continental began planning to drill the Lonesome Dove 42-17 SWD well. The purpose of the well was to dispose of salt water by injecting it into the Lodgepole formation. This formation is located approximately 10,000 feet below the Subject Property. A number of letters were sent to the Fishers notifying them of Continental's plan to drill the well. There is no dispute the Fisher's received the letters.

The first letter was dated October 26, 2011, and entitled "NOTICE OF DRILLING OPERATIONS." It referenced the Lonesome Dove 41-17 SWD well, and stated the purpose of the letter was to advise the Fishers that Continental was planning to drill for oil and gas on their property. The reference to "41-17" rather than "42-17" is presumably a typographical error. Continental offered $7,779.00 in compensation for surface disruption. The letter was sent by Diamond Resources landman Roland Olson. See Docket No. 18-1, pp. 4-5.

The second letter was dated December 6, 2011. It notified the Fishers of Continental's intention to "complete the Lonesome Dove #42-17 well as a Class II Salt Water Disposal Well." There was no offer of compensation made by Continental in the letter. The letter was sent by Terry L. Olson, a Continental Resources Regulatory Compliance Specialist. See Docket No. 18-1, p. 6.

A third letter was sent on December 28, 2011. This letter is virtually identical to the first letter sent on October 26, 2011. The only differences appear to be a correct description of the well using the 42-17 designation and an increase in the offered compensation to $9,279.00. This letter was also signed by Diamond Resources landman Roland Olson. See Docket No. 18-1, pp. 7-8.

Another notification of Continental's intention to "complete the Lonesome Dove #42-17 well as a Class II Salt Water Disposal Well" was sent on March 5, 2012. The letter appears identical to the December 6, 2011, letter. The letter was again sent by Terry L. Olson, a Continental Resources Regulatory Compliance Specialist. See Docket No. 18-1, p. 9.

A fifth letter was sent on October 1, 2012, by Diamond Resources landman Roland Olson and is very similar to his two prior letters. Reference is made to drilling for oil and gas. Two compensation offers are made including a $10,779.00 lump sum offer. See Docket No. 18-1, pp. 11-12.

On May 20, 2013, Continental obtained a permit from the North Dakota Industrial Commission to operate the Lonesome Dove 42-17 SWD well as a salt water disposal well. See Docket No. 14-6, pp. 1-3. The record does not reflect the precise date on which Continental completed the drilling of the well, but it is clear the well was complete by the time the complaint was filed in July of 2013. A pipeline was also constructed across the Subject Property to transport salt water to the well. The record is not clear as to whether the salt water disposal well has been put into operation. Continental states in its brief that it has yet to use the well. It is also unclear from the record whether off-Unit salt water has or will be injected through the well.

The Fishers essentially contend Continental has no legal right to construct a salt water disposal well and pipeline on their property, or dispose of salt water in the pore space underneath the Subject Property. The Fishers commenced this action in state court on or about July 26, 2013. They assert claims for nuisance, trespass, fraudulent misrepresentation, and deceit. They seek monetary damages, an accounting of the salt water injected into the well, and injunctive relief in the form of an order for ejectment. The parties have not entered into any salt water disposal agreement authorizing Continental's activities. Continental contends the Unit Agreement and North Dakota law authorize its activities.

Continental removed the action to federal court on August 19, 2013, citing diversity of citizenship as the jurisdictional basis for removal. Continental filed an answer and counterclaim on August 26, 2013. In its counterclaim, Continental seeks a declaration that it is entitled to use as much of the surface of the Subject Property as is reasonably necessary to construct and operate a salt water disposal well, including the laying of pipeline to the well. The operation of the well would presumably entail injecting salt water into the pore space underneath the Subject Property.

4

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1). The court must consider the substantive standard of proof when ruling on a motion for summary judgment. Anderson, 477 U.S. at 252.

## III. LEGAL DISCUSSION

This case presents a dispute between the surface and pore space estates and the mineral estate. The underlying facts are largely undisputed. The heart of the dispute concerns what North Dakota law requires or permits with regard to salt water disposal wells and pore space.

In North Dakota, it is well-settled that "where the mineral estate is severed from the surface estate, the mineral estate is dominant." Hunt Oil Co. v. Kerbaugh, 283 N.W.2d 131, 135 (N.D. 1979). The mineral estate is dominant because the law implies in the mineral estate a right to make use of the surface estate to the extent necessary to find and develop the minerals. The mineral estate would be virtually worthless if the law did not imply such a right. However, this right is "limited to so much of the surface and such use thereof as are reasonably necessary to explore, develop, and transport the minerals. Id. (emphasis added). Reasonable use of the surface is implied, even if not expressly granted by lease or deed, based on the principle that when a thing is granted all reasonable means to obtain it are granted as well. 4 Summers, Oil and Gas § 40:4 (3d ed. 2009). "[T]he mineral estate owner has no right to use more of, or do more to, the surface estate than is reasonably necessary to explore, develop, and transport the minerals." Hunt Oil, 283 N.W.2d at 135. It is also clear mineral developers must compensate surface owners for damages to the surface estate made in conjunction with oil and gas drilling operations. N.D.C.C. Chapter 38-11.1.

In recognition and furtherance of the principle the mineral estate may use no more of the surface estate than is reasonably necessary, the North Dakota Supreme Court has adopted the "accommodation doctrine." Hunt Oil, 283 N.W.2d at 136. The "accommodation doctrine" expressly recognizes that each estate in the same piece of property should have the right to use and enjoy an interest in the property to the fullest extent, which is not inconsistent with the rights of the

other estate holders. The test for reasonableness under the "accommodation doctrine" requires a consideration of all the pertinent circumstances including what are the usual, customary, and reasonable practices in the industry, and the nature, condition, location, and current use of the servient estate. Id. It is clear and undisputed under North Dakota law that whether the use of the surface estate by the mineral estate is reasonable is a question of fact. Id. at 137. Further, the burden of proof rests on the surface estate to establish the use is not reasonable.

North Dakota, like most oil-producing states, has a compulsory unitization statute. See N.D.C.C. §§ 38-08-09.1 to 38-08-09.16. "Unitization, as opposed to pooling, is the consolidation of mineral or working interests covering all or part of a common source of supply. Within the unitized area there may be many spacing, drilling, or pooled units." Bruce M. Kramer & Patrick H. Martin, The Law of Pooling and Unitization § 6.02 (3d ed. 2013). An order of the North Dakota Industrial Commission creating a unit agreement does not become effective until approved by those person's who, under the unit agreement, will be required to pay sixty percent (60%) of the costs of unit operation and sixty percent of the royalty owners within the proposed unitized area. N.D.C.C. § 38-08-09.5.[1]

Unitization establishes a contractual or statutory status of co-tenancy among the parties who have the right to produce oil and gas from the unit, that is, the working interest owners and the unleased mineral owners. Kramer & Martin, supra, at § 12.01. Each co-tenant is entitled to a proportionate share of the production and, depending on the terms of the unit agreement and applicable statutes and regulations, is also obligated to share in the production costs. Many states, including North Dakota, provide for the imposition of a "risk penalty" on a non-participating

---

[1] At the time the Unit in this case was created, North Dakota law required seventy percent (70%) approval.

owner's share of production. Id.; N.D.C.C. § 38-08-09.4(3). A "risk penalty" is imposed because drilling an oil well is a speculative undertaking and "[s]uccess has a thousand fathers; a dry hole is an orphan." Kramer & Martin, supra, at § 12.01.

The Unit Agreement sets out the rights and obligations of the oil and gas company which has been selected to act as the Unit Operator.

> The right of the unit operator to use the surface for unit operations is more than a collection of rights under the various leases. The right to the use of the surface of each tract is not restricted to drilling, producing, and marketing oil or gas from that particular tract. The unit operator has the right to use any of the surface within the unit for the purpose of carrying out the unit plan so long as such use is reasonable and does not unduly burden any particular tract. Accordingly, he may use land in the unit for purposes of constructing a pipeline to market unit production which was not produced from the land so used, and he is not required to obtain an easement from the owner of the surface.

5 Eugene Kuntz, Law of Oil and Gas § 78.4 (2014).

These principles of oil and gas law are well-settled and undisputed by the parties. However, there remains a disputed question of law which is central to the resolution of this motion, namely whether the Unit Agreement and the reasonable use doctrine permit Continental, as the Unit Operator, to drill a salt water disposal well on the Fisher's property which is located within the Unit, and then dispose of salt water underneath the Fisher's property.

### A.  SALT WATER DISPOSAL ACTIVITIES

Continental contends a salt water disposal well and related infrastructure are reasonably necessary and required for the development of the mineral interests in the Unit. Continental contends salt water disposal operations are contemplated by the language in the Unit Agreement which defines the rights and obligations of the Unit Operator. Continental acknowledges the Fishers

8

are entitled to compensation for surface damage caused by the development of the Lonesome Dove 42-17 SWD and related pipeline infrastructure, but argue the Fishers have not pled such a claim.

The Fishers recognize the right of Continental to develop the minerals, but maintain salt water disposal activities are separate and distinct from oil exploration and recovery efforts, and thus cannot constitute a reasonable use of the surface estate. The Fishers contend they have the right to exclude Continental from conducting salt water disposal activities on and underneath their property.

The Fishers rely on Buchholz v. Burlington Resources Oil & Gas Co. LP, 755 N.W.2d 914 (N.D. 2008) to support their argument. In *Buchholz*, two sets of surface owners brought actions against an oil company for breach of their respective salt water disposal agreements. Id. at 915. The actions were consolidated for trial. The salt water disposal agreements permitted the oil company to convert abandoned oil wells to salt water disposal wells, and required the oil company to pay five cents per barrel for salt water disposed of in the well. Id. at 916-17. The salt water disposal wells were drilled and operated for several years before the North Dakota Industrial Commission created the Cedar Hills-Red River "B" Unit.[2] The salt water disposal wells were located in this unit.

After the field was unitized, the oil company quit paying the five cent per barrel disposal fee. The oil company took the position the unitization order from the North Dakota Industrial Commission nullified or modified the salt water disposal agreements and relieved it of its obligation to pay the five cent per barrel disposal fee. Id. at 916. The North Dakota Supreme Court upheld the trial court's determination that the salt water disposal agreements had not been modified or nullified by unitization. The North Dakota Supreme Court found the oil company had misconstrued the authority granted to it by the Industrial Commission's order, as that order authorized water injection

---

[2]This is the same Unit at issue in the present dispute.

only for enhanced recovery efforts and not salt water disposal and the order did not modify or amend the existing salt water disposal agreements. Id. at 917-18. Further, the North Dakota Supreme Court noted, without deciding, that even if an oil company acting as unit operator has a general right to use the surface and existing wells within the unit for salt water disposal, prior agreements must still be given full force and effect and would be modified or amended only to the extent necessary to conform to applicable statutes and Industrial Commission orders. Id. at 919.

The legal issue left unresolved in *Buchholz* is the precise question presented in this case, namely whether a Unit Operator has the general right to construct and operate a salt water disposal well within the Unit. There are no North Dakota cases directly on point. However, cases from a number of other jurisdictions answer the question in the affirmative, although that right is subject to the well-established requirement that any such use be reasonable. Gill v. McCollum, 311 N.E.2d 741, 743 (Ill. App. Ct. 1974); Leger v. Petroleum Eng'rs, Inc., 499 So.2d 953, 956 (La. Ct. App. 1986); Colburn v. Parker & Parsley Dev. Co., 842 P.2d 321, 327 (Kan. Ct. App. 1992); McNeill v. Rice Eng'g & Operating, Inc., 70 P.3d 794, 801 (N.M. Ct. App. 2003). The rule of law is best stated by the Kansas Court of Appeals in *Colburn* which held as follows:

> [T]he granting clause in an oil and gas lease includes an implied covenant to dispose of the salt water produced during operations by utilizing a saltwater disposal well drilled on the leased premises without additional compensation to the lessor.

Colburn, 842 P.2d at 327. Implying such a covenant is necessary in order for the production of oil and gas to be accomplished. This "implied covenant is limited to saltwater produced on the lease and does not extend to saltwater produced on other leases." Dick Props., LLC v. Paul H. Bowman Trust, 221 P.3d 618, 621 (Kan. Ct. App. 2010); Gill, 311 N.E.2d at 743 (finding salt water disposal must bear some relation to obtaining oil production from the lease, and accepting salt water from

10

other leases failed the test). If a lessee wishes to use a salt water disposal well on one lease to dispose of salt water produced on other leases, a salt water disposal lease is required. Dick Props., 221 P.3d at 621.

The opinion in *Leger* is also instructive. In *Leger*, the mineral lessors sued the mineral lessee over the disposal of waste salt water on their property. Leger, 499 So.2d at 954. Three wells had been drilled on the property which was subject of an oil and gas lease and two of the wells produced oil. Id. The third was a dry hole which was converted to a salt water disposal well in order to receive salt water produced from the other two wells. Id. at 954-55. The lessors contended the injection of salt water into the dry hole was an impermissible use under the lease. In 1986, the Louisiana Court of Appeals held that while the granting clause in the mineral lease did not specifically address salt water injection wells, it was broad and general enough to imply a grant of the right to dispose of salt water produced on the leased property. Id. at 955. The court reasoned that a salt water disposal well was reasonably necessary for the accomplishment of the purpose of the lease. The Louisiana appellate court noted the production of salt water was an unavoidable result of oil production, and the necessity of the method of salt water disposal was made clear from the record.

In this case it is unclear whether the minerals underlying the Subject Property have been leased. However, there is no question the owner of the mineral rights is entitled to a share of the unit production by virtue of the Unit Agreement. Despite the lack of a lease, since the Subject Property is subject to compulsory unitization we need to look to the statute authorizing unitization, the Unit Agreement, and the Unit Operating Agreement. The purpose of unitization is to permit the entire unit "to be operated without regard to surface boundary lines." Patrick H. Martin and Bruce M.

Kramer, Williams & Meyers, Oil and Gas Law § 901 (2013). Unitization gives the unit operator the right and obligation to conduct oil and gas recovery operations throughout the unit. See Kuntz, supra § 78.4. "If the unit operator is unable to gain access to and unable to use the land for unit operations, . . . the purpose sought to be attained by the state conservation order may be defeated." Kramer & Martin, The Law of Pooling and Unitization, § 20.06[1]. Since unitization is usually favored "courts frequently find that there is an implied easement to use the land for unit operations" . . . "or that an order of the conservation agency gives the right of use for unit operations." Id.

North Dakota's unitization statute recognizes the need of the unit operator to have access to the entire unit in order to carry out oil field operations. "Wells drilled or operated on any part of the unit area no matter where located must for all purposes be regarded as wells drilled on each separately owned tract within such unit area." N.D.C.C. § 38-08-09.8. In the closely-related context of forced pooling, the North Dakota Supreme Court has recognized the creation of a pooled spacing unit gives the unit operator the right to make reasonable use of the surface and subsurface of the entire pooled unit, without regard to whether the operator holds a lease covering that particular part of the pooled unit. Cont'l Res. Inc. v. Farrar Oil Co., 559 N.W.2d 841, 846 (N.D. 1997).

In *Farrar Oil*, Continental owned leases covering the northwest and southeast quarter sections of a one-section spacing unit. Id. at 843. Farrar Oil owned leases covering the northeast and southwest quarters of the section. Continental proposed drilling a horizontal well from a surface location in the northwest quarter of the spacing unit to a point underneath the southwest quarter, but Farrar Oil refused the offer. After obtaining an order from the North Dakota Industrial Commission pooling all interests in the spacing unit, Continental brought suit in state district court seeking a declaratory judgment confirming its right to drill and operate the proposed well. Id. at 844. Farrar

12

Oil counterclaimed for a declaration that the proposed well would constitute a trespass. Id. The district court entered judgment in favor of Continental. The North Dakota Supreme Court affirmed explaining that the State's police powers, as exercised by the North Dakota Industrial Commission, permit the compulsory pooling of mineral interests and effectively superseded Farrar Oil's right to use its lease as it pleases. Id. at 846.

> Since force-pooled oil and gas operations are "deemed, for all purposes," to be the proper "conduct of such operations upon each separately owned tract in the drilling unit by the several owners thereof" under NDCC 38-08-08(1) of the Resources Act, the property law of trespass does not affect those authorized operations and, to that extent, property law is necessarily superseded.

Id. at 846. The North Dakota Supreme Court further explained that "[t]o hold otherwise . . . would frustrate the purposes of the North Dakota Resources Act and would make an Industrial Commission's forced pooling order ineffectual." Id.

The Unit Agreement in this case contains language permitting injections as part of enhanced recovery operations, but that language does not necessarily support a right to operate a salt water disposal well. See Buchholz, 755 N.W.2d at 917-18 (rejecting argument that enhanced recovery language in Industrial Commission order authorized the unit operator to conduct salt water disposal operations). However, paragraph 10 of the Unit Agreement establishes the rights and obligations of the Unit Operator and provides as follows:

> 10. Rights and Obligations of the Unit Operator. Except as otherwise specifically provided herein, the exclusive right, privilege, and duty of exercising any and all rights of the parties hereto, including surface rights, which are necessary or convenient for prospecting for, producing, storing, allocating, and distributing the Unitized Substances are hereby delegated to and shall be exercised by the Unit Operator as herein provided. Acceptable evidence of title to said rights shall be deposited with said Unit Operator and, together with this Agreement, shall constitute and define the rights, privileges, and obligations of the Unit Operator. Nothing herein, however, shall be construed to transfer title to any land or to any lease or operating agreement, it being understood that under this Agreement the Unit

13

> Operator, in its capacity as the Unit Operator, shall exercise the rights of possession and use vested in the parties hereto only for the purposes herein specified.

See Docket No. 14-3, p. 22, ¶ 10. This clause is akin to the granting clause in a standard oil and gas lease, and is arguably similar to the granting clause cited in *Colburn* which provided as follows:

> "grant, lease, and let exclusively unto the lessee the hereinafter described land . . . for the purpose of . . . drilling, mining, and operating for . . . oil . . . and for constructing roads, laying pipelines, building tanks, storing oil, building power stations, telephone lines and other structures thereon necessary or convenient for the economical operation of said land alone or conjointly with neighboring lands, to produce, save, take care of, and manufacture all of such substances, and for housing and boarding employees . . . ."

Colburn, 842 P.2d at 324 (finding the granting clause was broad enough to imply a covenant for on-premises salt water disposal). The Unit Agreement is analogous to an oil and gas lease. Both agreements grant the right to conduct oil and gas recovery operations. All mineral owners within the Unit share in the benefits of production, and there would seem to be no reason why all servient surface estates would not be subject to reasonable use for the benefit of the Unit. See Gulf Oil Corp. v. Deese, 153 So.2d 614, 618-19 (Ala. 1963) (finding the surface of all tracts within a pooled unit must be available for use in connection with the operation of an oil and gas well so long as the use was reasonably necessary for production from the pool).

The Court concludes, as a matter of law, that Section 38-08-09.8 of the North Dakota Century Code, the unitization order, the Unit Agreement, and the Unit Operating Agreement are broad enough to be read as including an implied covenant to drill a salt water disposal well within the Unit in order to dispose of salt water produced by Unit operations. Thus, as long as Continental Resources acts in a reasonable manner and does not use the Lonesome Dove 42-17 SWD well to dispose of salt water produced outside of the Unit, its actions are not considered unlawful. If this were not so, the purpose of compulsory unitization could never be attained. Kramer & Martin,

supra, at § 20.06[1]. Further, there is no question the Fishers are statutorily entitled to compensation for damage to the Subject Property which is related to the construction and use of the Lonesome Dove 42-17 SWD well in accordance with North Dakota law. See N.D.C.C. Ch. 38-11.1.

In summary, the Court finds that Continental, as the Unit Operator, has a general right to conduct salt water disposal operations within the Unit. However, that finding does not necessarily mean any action undertaken by the Unit Operator is considered to be reasonable. It is clear under North Dakota law that whether a particular activity being conducted is reasonable is a question of fact. Hunt Oil, 283 N.W.2d at 137. In *Hunt Oil*, the North Dakota Supreme Court, quoting a Texas decision, explained the types of uses that are reasonably necessary to oil and gas operations.

> The reasonableness of a surface use by the lessee is to be determined by a consideration of the circumstances of both and, as stated, the surface owner is under the burden of establishing the unreasonableness of the lessee's surface use in this light. The reasonableness of the method and manner of using the dominant mineral estate may be measured by what are usual, customary and reasonable practices in the industry under like circumstances of time, place and servient estate uses. What may be a reasonable use of the surface by the mineral lessee on a bald prairie used only for grazing by the servient surface owner could be unreasonable within an existing residential area of the City of Houston, or on the campus of the University of Texas, or in the middle of an irrigated farm. What we have said is that in determining the issue of whether a particular manner of use in the dominant estate is reasonable or unreasonable, we cannot ignore the condition of the surface itself and the uses then being made by the servient surface owner. . . . [I]f the manner of use selected by the dominant mineral lessee is the only reasonable, usual and customary method that is available for developing and producing the minerals on the particular land then the owner of the servient estate must yield. However, if there are other usual, customary and reasonable methods practiced in the industry on similar lands put to similar uses which would not interfere with the existing uses being made by the servient surface owner, it could be unreasonable for the lessee to employ an interfering method or manner of use. These conditions involve questions to be resolved by the trier of the facts.

Id. at 136–37 (quoting Getty Oil Co. v. Jones, 470 S.W.2d 618, 627–28 (Tex. 1971)).

Thus, it is clear and undisputed under North Dakota law that whether a particular use is reasonable depends on the facts and circumstances of each case, including the condition of both the dominant and servient estates, and the usual and customary methods for developing the mineral estate. When a surface owner challenges the reasonableness of a particular use, the burden of proof clearly rests with the surface owner to show the operator used the surface unreasonably. Id. at 136.

The record reveals the Unit consists of approximately 50,000 acres. It is arguably debatable whether it was reasonably necessary to use the Subject Property, as opposed to some other tract within the Unit, for salt water disposal operations. The salt water produced by Continental's Unit operations could be taken elsewhere by truck or pipeline, recycled, or used for enhanced recovery operations. Whether such alternatives are reasonable remains an issue to be resolved by the fact finder. In addition, questions of fact remain as to whether the Lonesome Dove 42-17 SWD well has been put into use, and whether it has or will receive waste water from outside the Unit. It will be necessary for the Fisher's to demonstrate at trial that reasonable alternatives are available and the construction and use of the Lonesome Dove 42-17 SWD well was not reasonably necessary. It is clear there are a number of genuine issues of material fact which remain disputed and/or unknown. Thus, summary judgment on the Fisher's claims for trespass and nuisance are not warranted at this stage.

### B. NOTICE

In support of their claims for fraudulent misrepresentation and deceit, the Fishers contend the notices they received were unclear as to whether Continental intended to drill an oil and gas well or a salt water disposal well. Continental contends the letters sent to the Fisher's were not

misleading and, even if they were, the Fisher's cannot demonstrate reliance. Reliance is an essential element of any claim of fraud or deceit. Dahl v. Messmer, 719 N.W.2d 341, 344 (N.D. 2006).

The Court has reviewed the letters sent to the Fishers and finds the letters are arguably confusing and contradictory. In viewing all the letters as a whole, it is unclear as to Continental's intentions. Some of the letters reference the drilling of a salt water disposal well and offer no compensation, whereas other letters reference the drilling of an oil and gas well with specific offers of compensation. The Fishers are statutorily entitled to "sufficient disclosure of the plan of work and operations to enable the surface owner to evaluate the effect of drilling operations on the surface owner's use of the property." N.D.C.C. § 38-11.1-04.1(2)(a). The communications from Continental create a question of fact as to whether this occurred. Further, the Fishers cannot properly evaluate the damage to their property if they are unclear as to what type of well is to be constructed. Thus, it cannot be said for summary judgment purposes, that the Fishers cannot show detrimental reliance. The Court recognizes the Fishers may have a number of difficult hurdles at trial to demonstrate that Continental intended to deceive them, but that is ultimately a matter for the jury to resolve rather than the Court at this stage of the litigation. See Kary v. Prudential Ins. Co., 541 N.W.2d 703, 705 (N.D. 1996) (discussing elements of fraud).

### C. DAMAGES

Finally, Continental contends the Fishers have not properly pled a claim for damages under N.D.C.C. § 38-11.1-04. The Fishers contend their request for monetary damages encompasses Section 38-11.1-04. The parties also disagree as to whether damages are available for the use of the pore space underneath the Subject Property. The Court concludes that, under North Dakota's liberal

pleading standards, the complaint, while not a model of clarity, may be fairly read as encompassing a claim for damages under N.D.C.C. § 38-11.1-04. The substance of the complaint is one for damages attendant to the construction of the Lonesome Dove 42-17 SWD well. See Falkenstein v. Dill, 820 N.W.2d 382, 385 (N.D. 2012) (looking to the substance of the complaint to determine if the Rule 8 pleading standards had been met). It is clear from the record that Continental will not be prejudiced by this determination as the company has been aware since it began planning the construction of the Lonesome Dove 42-17 SWD well that it would be required to compensate the Fishers. Whether Section 38-11.1-04 encompasses damages for use of the pore space remains an open question under North Dakota law.[3] As the parties have not fully briefed the issue the Court declines to resolve the matter at this time.

---

[3]Implicit in the use of a salt water disposal well is occupation of the subsurface pore space by the salt water. In North Dakota, property rights extend to the sky and to the depths. See N.D.C.C. § 47-01-12. Property rights are protected by the North Dakota Constitution and no person may be deprived of property without due process of law. Farrar Oil Co., 559 N.W.2d at 845 (citing N.D. Const. art. I, §§ 1, 12, and 16).

In 2009, North Dakota enacted Chapter 47-31 which is entitled "Subsurface Pore Space Policy." It is clear title to the pore space estate is vested in the owner of the surface estate. N.D.C.C. § 47-31-03. Severance of the pore space from the surface estate is prohibited, but leasing of the pore space is permitted. N.D.C.C. §§ 47-31-05 and 47-31-06. Chapter 47-31 does not address damages for trespass to pore space or use of the pore space by a mineral developer, and there are no reported cases applying any provisions of the chapter. North Dakota's laws relating to the underground storage of carbon dioxide require that all non-consenting pore space owners be compensated. See N.D.C.C. §§ 38-22-08(5) and 38-22-08(14).

Chapter 38-11.1 addresses compensation for damage and disruption of the surface owner's land occasioned by oil and gas exploration and development, but makes no mention of pore space. The North Dakota Supreme Court has not addressed whether Chapter 38-11.1 may be read to encompass compensation for use of pore space. The purpose of Chapter 38-11.1 is to "provide the maximum amount of constitutionally permissible protection to surface owners and other persons from the undesirable effects of development of minerals." N.D.C.C. 38-11.1-02. Chapter 38-11.1 is to be interpreted in order to benefit surface owners. The express language of Section 38-11.1-04 requires compensation for all damage to the surface owner's land. "The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner . . . for lost land value [and] lost use of and access to the <u>surface owner's land</u>." N.D.C.C. § 38-11.1-04 (emphasis added). Arguably, the pore space is a part of the surface owner's land. The North Dakota Legislature has irrevocably tied the pore space estate to the surface estate in Chapter 47-31. Thus, a compelling argument can be made that the language and purpose of Chapter 38-11.1 are broad enough to encompass compensation for use of the pore space.

18

**IV.    CONCLUSION**

The Court has carefully reviewed the entire record, the parties' submissions, and the record as a whole. For the reasons set forth above, Continental's motion for summary judgment (Docket No. 11) is **DENIED**. The Fishers' request for a hearing (Docket No. 26) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 8th day of September, 2014.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court
